**NUMBER 13-08-585-CR**
**COURT OF APPEALS**
**THIRTEENTH DISTRICT OF TEXAS**
**CORPUS CHRISTI ‑ EDINBURG**



**GILBERTO ALCARIO AMARO, III,**                                              **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                       **Appellee.**

**On appeal from the 156th District Court
of Bee County, Texas.**

## MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Vela
Memorandum Opinion by Justice Vela**

A jury convicted appellant, Gilberto Alcario Amaro, III, of the offense of possession with intent to deliver cocaine in the amount of more than one gram but less than four grams, a second-degree felony. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(3)(D) (Vernon Supp. 2008), .112(a), (c) (Vernon 2003). The trial court, having found true the enhancement allegation that Amaro previously had been convicted of one felony offense,

assessed punishment at fifty years' incarceration in the Institutional Division of the Texas Department of Criminal Justice. Amaro brings five issues for our consideration. We affirm.

## I. FACTUAL BACKGROUND

On February 12, 2008 at approximately 11:00 a.m., Beeville police officer Michael Willow was dispatched to a 9-1-1 call from the Esquire Motel in Bee County, Texas; the call was for "shots fired." Upon arriving at the motel, he saw Regan Scott, an assistant police chief, tending to Jesse Martinez, who had been wounded by a shotgun blast and was lying in the parking lot. Officer Willow saw Amaro, who had a gunshot wound to the abdomen, lying across the threshold of the door to room 118. A shotgun and a nine-millimeter Ruger were within Amaro's reach, and spent casings from both weapons were found in the doorway of room 118.

When Officer Willow arrived at room 118, Lieutenant Jefferson of the Beeville police department was standing outside the room tending to Amaro and told Officer Willow that room 118 had not been secured. Officer Willow entered the room in order to perform a "clearance" of the room, i.e., to check for other suspects possibly armed in the room who could have been involved in the shooting, thereby protecting the safety of others at the scene. After Amaro was taken to the hospital, Officer Willow obtained a search warrant for room 118. He and others searched the room and recovered the following: (1) clear cellophane baggies with white residue inside; (2) four digital scales; (3) seven cellular phones; (4) a cell phone case containing $330.00; (5) a wallet with $35.00; (6) a smoking pipe with a small baggie of marihuana; (7) batteries; (8) baking soda; (9) a switchblade knife with a white powdery substance on the tip; and (10) 1.66 grams of cocaine. A portion of the cocaine was discovered hidden in a heating vent. The only working cell phone, the wallet, the cell phone case with the money, and one of the recovered baggies of cocaine

were found in the night stand by the bed. The cell phone had Amaro's mother's phone number listed as "Mom." The search of the motel room also turned up an IRS W–2 form with Amaro's wages and earnings and men's coats hanging behind the door.

Yvette Cruz, the motel's manager, testified that Amaro checked into the motel with his girlfriend, Zenaida Esparza, in November 2007. The motel room was rented in Amaro's name, and he initially paid on a daily basis but later began paying on a weekly basis. Amaro and Esparza stayed in three different rooms from November to February, and they were in room 118 on February 12, 2008. Cruz testified that Amaro made a payment for the motel room on February 8, 2008.

Esparza testified that Amaro left the motel room on February 9, 2008. She stated that she allowed Richard Guerra, her drug dealer, to use her residence to "break up" and "bag" cocaine and that she allowed him to leave his scales and baggies at her residence while he went to make a drug delivery. Esparza contacted Amaro on February 12 and asked him to take her to do some laundry. She testified that before he came to pick her up, she hid all the scales, baggies, and cocaine in the top dresser drawer to prevent Amaro from seeing them. She had no knowledge of the cocaine hidden in the heating vent but stated that the shotgun found in the motel room belonged to Amaro and that he needed it for protection. Esparza testified that soon after Amaro arrived to pick her up, Martinez knocked on the door and asked for Amaro. Amaro pushed her away, and she ran to her brother's motel room at the Esquire Motel and called 9-1-1. While in her brother's motel room, she heard gunshots.

Amaro's sister, Gina Guzman, testified that Amaro stayed at his parent's house on February 9, 2008. She stated that Amaro showed up at her house on the evening of February 10, looked to see what was wrong with her refrigerator and spent the night at her

3

house.  On February 11, Guzman left for work around 7:40 a.m.  Amaro did some work at Guzman's house and spent the night of February 11th there.  Guzman's testimony established Amaro's presence at her house on February 10 and for some of the following day, but Guzman left for work at 7:40 a.m. and returned from work at approximately 6:30 p.m.  There was evidence that some work had been performed by Amaro at the Guzman residence while Guzman was at work, but there is no evidence in the record conclusively establishing his whereabouts for the entire day.

## II. DISCUSSION

### A. *Motion to Suppress*

In his first issue, Amaro argues the trial court abused its discretion by denying his motion to suppress the evidence seized from the motel room.  *See* U.S. CONST. amend. IV;[1] TEX. CONST. art. I § 9.

#### *1. Standard of Review*

When, as in this case, a trial court "enters findings of fact after denying a motion to suppress, an appellate court must first determine whether the evidence viewed in the light most favorable to the trial court's ruling, supports these fact findings." *Keehn v. State*, 279 S.W.3d 330, 334 (Tex. Crim. App. 2009) (internal quotation omitted).  "If the findings are supported by the record, appellate courts will 'afford almost total deference to a trial court's determination of the historical facts' 'when they are based on an evaluation of credibility and demeanor.'"  *Id*. (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).  "Appellate courts give 'the same amount of deference' to 'mixed questions of law and fact if the resolution of those ultimate questions turns on an evaluation of credibility

---

[1] The Fourth Amendment protects the "right of the people to be secure . . . against unreasonable searches . . . and no Warrants shall issue, but upon probable cause. . . ."  U.S. CONST. amend. IV.

4

and demeanor.'" *Id*. (quoting *Guzman*, 955 S.W.2nd at 89). "But when the resolution of mixed law and fact questions do not depend upon an evaluation of credibility and demeanor, appellate courts are permitted to conduct a de novo review." *Id*.

Because the trial court was the sole and exclusive trier of fact at the suppression hearing, we will not set aside the denial of Amaro's motion to suppress evidence absent a showing of an abuse of discretion. *Guzman*, 955 S.W. 2d at 89; *Maddox v. State*, 682 S.W. 2d 563, 564 (Tex. Crim. App. 1985); *Jackson v. State*, 968 S.W.2d 495, 498 (Tex. App.–Texarkana 1998, pet. ref'd) (citing *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996)). If the determination was "reasonably supported by the record, and was correct under any theory of law applicable to the case," we are not at liberty to disturb the trial court's findings. *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002); *Etheridge v. State*, 903 S.W.2d 1, 15 (Tex. Crim. App. 1994); *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *State v. Hopper*, 842 S.W.2d 817, 819 (Tex. App.–El Paso 1992, no pet.). Therefore, instead of engaging in a factual review of the record, we will "view the evidence in a light most favorable to the trial court's ruling" to decide only whether the trial court improperly applied the law to the facts. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006); *Romero*, 800 S.W.2d at 543.

*2. Protective Sweep*

A "protective sweep" is a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Reasor v. State*, 12 S.W.3d 813, 815 (Tex. Crim. App. 2000) (quoting *Maryland v. Buie*, 494 U.S. 325, 328 (1990)). "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an

5

individual posing a danger to those on the arrest scene." *Id*. at 816 (citing *Buie*, 494 U.S. at 337). Further, a motel room occupant has the same constitutional protections against unreasonable searches and seizures with respect to the motel room as an occupant of a home. *Stoner v. California*, 376 U.S. 483, 490 (1964); *see Moberg v. State*, 810 S.W.2d 190, 194 (Tex. Crim. App. 1991).

The sweep "may only extend 'to a cursory inspection of those spaces where a person may be found' and may only last long enough to 'dispel the reasonable suspicion of danger.'" *Reasor*, 12 S.W.3d at 816 (quoting *Buie*, 494 U.S. at 336). "Furthermore, the protective sweep is not an automatic right the police possess when making an in-home arrest." *Id*. "It is permitted only when justified by a reasonable, 'articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene.'" *Id*. (quoting *Buie*, 494 U.S. at 337). In other words, "[w]hen conducting an in-home arrest, a police officer may sweep the house only if he possesses an objectively reasonable belief, based on specific and articulable facts, that a person in that area poses a danger to that police officer or to other people in that area." *Id*. at 817.

*3. Analysis*

Officer Willow testified that when he arrived at the motel, he saw that Amaro and Martinez had been wounded by gun fire. Martinez was lying in the parking lot, and Amaro was lying in the threshold of the open door to room 118. Officer Willow testified that when he arrived at room 118, Lieutenant Jefferson, who was standing outside the room tending to Amaro, told him that the room had not been secured. Officer Willow testified that when he entered the room, he "was looking for other suspects possibly armed in the room that could have been involved in the shooting. . . ." When the prosecutor asked him why he needed to determine whether other suspects might be in the room, he said, "Well, for the

6

safety of the emergency medical personnel, for the safety of the officers that were there and also for the witnesses that were in the parking lot still." When Officer Willow entered the room to perform the sweep, he saw a digital scale on a table, and he saw what appeared to be drug residue on a plate, on a night stand. He testified that the sweep took "about three seconds." After clearing the room, he stood outside the open door to the room in order to hold an I.V. bag that a medical technician was putting into Amaro, who was still lying by the doorway to the room. While holding the I.V. bag, Officer Willow saw some nine-millimeter shell casings inside the room and a "little box of plastic baggies next to the digital scales." He testified the corners of the plastic baggies are used to package narcotics for distribution.

Because Officer Willow had an objectively reasonable belief, based on specific and articulable facts, that a person in that area posed a danger to him or other persons in the area, we hold he was justified in conducting a protective sweep of the motel room. *See Ramirez v. State*, 105 S.W.3d 730, 743 (Tex. App.–Austin 2003, no pet.) (holding officer was permitted to sweep the room in order to establish that no individuals were present). We find the trial court did not abuse its discretion by denying appellant's motion to suppress. Issue one is overruled.

B. *Whether Legally Sufficient Evidence Links Amaro to the Contraband*

In his second issue, Amaro argues the evidence is legally insufficient to establish an "affirmative link"[2] between him and the contraband.

---

[2] Nearly three years ago, the court of criminal appeals decided to change its terminology and refer to the concept of "affirmative links" as merely "links." *Evans v. State*, 202 S.W.3d 158, 162 n.9 (Tex. Crim. App. 2006).

7

*1. Standard of Review-Legal Sufficiency*

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Sanchez v. State*, 275 S.W.3d 901, 902 n.2 (Tex. Crim. App. 2009). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. The trier of fact is the sole judge of the weight and credibility of the evidence. TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *see Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

*2. Applicable Law*

In *Evans v. State*, the court of criminal appeals stated:

> [I]n a possession of a controlled substance prosecution, "the State must prove that: (1) the accused exercised control, management, or care over the substance; and (2) the accused knew the matter possessed was contraband." Regardless of whether the evidence is direct or circumstantial, it must establish that the defendant's connection with the drug was more than fortuitous. This is the so–called "affirmative links" rule which protects the innocent bystander–a relative, friend, or even stranger to the actual possessor–from conviction merely because of his fortuitous proximity to someone else's drugs. Mere presence at the location where drugs are found is thus insufficient, by itself, to establish actual care, custody, or control of those drugs. However, presence or proximity, when combined with other evidence, either direct or circumstantial (e.g., "links"), may well be sufficient to establish that element beyond a reasonable doubt. It is, as the court of

appeals correctly noted, not the number of links that is dispositive, but rather the logical force of all of the evidence, direct and circumstantial.

202 S.W.3d 158, 161-62 (Tex. Crim. App. 2006).

*3. Analysis*

A rational jury could have determined the following from the evidence: (1) room 118 was rented in Amaro's name: (2) Amaro paid for the rent on room 118; (3) as of February 12, 2008, Amaro was still renting room 118; (4) Amaro made a payment for room 118 on February 8, 2008; (5) Amaro was at room 118 when Officer Willow entered the room to perform a protective sweep of that room; (6) at the time he performed the sweep, no one else was in the room; (7) a search of room 118 shortly after the shooting revealed clear cellophane baggies with white residue inside, four digital scales, seven cellular phones, a cell phone case with $330.00 in it, a wallet with $35.00, a smoking pipe with a small baggie of marihuana, batteries, baking soda, a switchblade knife with a white powdery substance on the tip, and 1.66 grams of cocaine, a portion of which was discovered hidden in a heating vent; (8) Amaro was shot at the motel room apparently by Martinez who came there looking for him; (9) Amaro had a shotgun in the motel room which he needed for protection; (10) some of the contraband was in plain view in the room; (11) a working cell phone with Amaro's mother's phone number titled "Mom" was found in the motel room in a night stand drawer with contraband; (12) Esparza denied knowledge of the cocaine found hidden in the room's heater vent; (13) an IRS form W–2 with Amaro's name, wages, and earnings was found in the motel room; and (14) men's coats were found behind the motel room door.

The contrary evidence showed: (1) Amaro got into a fight with Esparza and spent the night of February 9, 2008 at his parent's house; (2) Esparza testified that the drugs

9

belonged to her and the contraband belonged to someone else; (3) Amaro spent the nights of February 10th and 11th at his sister's residence; (4) there is evidence of work completed at Guzman's residence while she was at work; and (5) Esparza testified that Amaro was not present at the motel room from when he left on February 8th until the morning of February 12th.

Viewing the evidence in the light most favorable to the verdict, we hold the evidence is legally sufficient to show that Amaro possessed a controlled substance, namely cocaine. More specifically, there is legally sufficient evidence to establish he knowingly exercised control, management, and care over the cocaine beyond a reasonable doubt. *See Evans*, 202 S.W.3d at 164-65. We therefore conclude, a rational trier of fact could find the essential elements of possession of a controlled substance and affirmatively link them to Amaro. We overrule issue two.

*C. Whether Factually Sufficient Evidence Links Amaro to the Contraband*

In his third issue, Amaro contends the evidence is factually insufficient to establish an "affirmative link" between him and the contraband.

*1. Standard of Review*

In a factual-sufficiency review, the only question to be answered is: "Considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt?" *Grotti v. State*, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008). Evidence can be deemed factually insufficient in two ways: (1) "the evidence supporting the conviction is 'too weak' to support the factfinder's verdict"; or (2) "considering conflicting evidence, the factfinder's verdict is 'against the great weight and preponderance of the evidence.'" *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009) (quoting *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). "When a court of appeals

conducts a factual-sufficiency review, [the court] must defer to the jury's findings." *Id*. (citing *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997)). The court of criminal appeals has "set out three 'basic ground rules' implementing this standard." *Id*. (quoting *Watson*, 204 S.W.2d at 414). First, the appellate court "must consider all of the evidence in a neutral light, as opposed to in a light most favorable to the verdict." *Id*. (citing *Watson*, 204 S.W.3d at 414). Second, the appellate court "may only find the evidence factually insufficient when necessary to 'prevent manifest injustice.'" *Id*. (quoting *Cain*, 958 S.W.2d at 407). Although the verdict is afforded less deference during a factual sufficiency review, an appellate court is not free to "override the verdict simply because it disagrees with it." *Id*. (citing *Cain*, 958 S.W.2d at 407). Third, the appellate court "must explain why the evidence is too weak to support the verdict" or why the conflicting evidence greatly weighs against the verdict. *Id*. (citing *Watson*, 204 S.W.3d at 414).

### 2. Analysis

Viewing the evidence in a neutral light, we find that the evidence is factually sufficient to show that Amaro possessed a controlled substance, namely cocaine. More specifically, there is factually sufficient evidence to establish he knowingly exercised control, management, and care over the cocaine. *See Evans*, 202 S.W.3d at 164-65. We hold that the evidence showing that Amaro possessed the cocaine is not so weak that the jury's determination is clearly wrong and manifestly unjust, or that the verdict is against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 414-17. Considering all the evidence in a neutral light, we conclude the trier of fact was reasonable in finding guilt beyond a reasonable doubt. Issue three is overruled.

11

*D. Whether Legal Sufficiency of the Evidence Establishes Intent to Deliver the Cocaine*

In his fourth issue, Amaro argues the evidence is legally insufficient to establish that he possessed the cocaine with the intent to deliver it.

*1. Applicable Law*

To obtain a conviction for the offense of possession of a controlled substance with intent to deliver, the State must prove, in addition to possession, that the accused intended to "transfer, actually or constructively, to another a controlled substance. . . ." TEX. HEALTH & SAFETY CODE ANN. §§ 481.002(8) (Vernon Supp. 2008), 481.112(a); *Utomi v. State*, 243 S.W.3d 75, 82 (Tex. App.–Houston [1st Dist.] 2007, pet. ref'd). The State may prove intent to deliver a controlled substance by "circumstantial evidence, including evidence concerning an accused's possession of the contraband." *Utomi*, 243 S.W.3d at 82; *Mack v. State*, 859 S.W.2d 526, 528 (Tex. App.–Houston [1st Dist.] 1993, no pet.). "An oral expression of intent is not required." *Utomi*, 243 S.W.3d at 82.

> "Additional factors that courts have considered [when] determining whether an accused had the intent to deliver the contraband include: (1) the nature of the location at which the accused was arrested; (2) the quantity of the contraband in the accused's possession; (3) the manner of packaging; (4) the presence, or lack thereof, of drug paraphernalia for either use or sale; (5) the accused's possession of large amounts of cash; and (6) the accused's status as a drug user."

*Id*.; *see Williams v. State*, 902 S.W.2d 505, 507 (Tex. App.–Houston [1st Dist.] 1994, pet. ref'd).

*2. Analysis*

Amaro was found in a motel room with cocaine. Testimony showed that the motel was very inexpensive and that motels allow for an easy relocation if the drug dealer suspects the location might have been discovered. The amount of cocaine that Amaro had in the motel room was not substantial; however, baking soda was found in

12

the motel room. When baking soda is added to cocaine, the aggregate weight of the cocaine is increased, thus increasing the amount for sale. Drug paraphernalia, i.e., digital scales, a knife with a white powdery substance on the tip, cellophane baggies with white residue in them, and cellophane baggies with the corners missing (the corners are used for drug distribution) were found in the motel room. These items are commonly used in drug distribution. Three-hundred-thirty dollars was found at the motel room. This is not a large sum of money; however, Esparza testified that Amaro gave her $500.00 to pay for rent even though the motel register showed he paid the weekly bill the day before. Moreover, Amaro had a prior conviction for possession of a controlled substance. Viewing all the foregoing evidence in the light most favorable to the verdict, we hold that a jury could have found beyond a reasonable doubt that Amaro possessed the cocaine with the intent to deliver it. Issue four is overruled.

*E. Factual Sufficiency of the Evidence-Intent to Deliver the Cocaine*

In his fifth issue, Amaro urges the evidence is factually insufficient to establish that he possessed the cocaine with the intent to deliver it. After neutrally examining all the evidence, we find that the proof of guilt was not so weak that the verdict is clearly wrong or manifestly unjust; nor is the verdict against the great weight and preponderance of the evidence. Issue five is overruled.

13

## III. Conclusion

We affirm the judgment of the trial court.


ROSE VELA
Justice


Do not publish.
Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and
filed this 2nd day of July, 2009.